UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------

MARINA XYDOUS,

                            Plaintiff,           **MEMORANDUM & ORDER**
                                              14-CV-3691 (MKB)

       v.

COMMISSIONER OF SOCIAL SECURITY,

                          Defendant.
---------------------------------------------------------------
MARGO K. BRODIE, United States District Judge:

      Plaintiff Marina Xydous, proceeding *pro se*, filed the above-captioned action seeking

review, pursuant to 42 U.S.C. § 405(g), of a final administrative decision of the Commissioner of

Social Security (the "Commissioner"), denying her claim for disability insurance benefits. On

July 7, 2014, the Court granted Plaintiff's request to proceed *in forma pauperis*. (July 7, 2014

Order, Docket Entry No. 4.) The Commissioner moves for judgment on the pleadings pursuant

to Rule 12(c) of the Federal Rules of Civil Procedure, claiming that the decision of

Administrative Law Judge Gal Lahat (the "ALJ") is supported by substantial evidence and

should be affirmed. (Comm'r Mot. for J. on the Pleadings, Docket Entry No. 16; Comm'r Mem.

in Support of Mot. for J. on the Pleadings ("Comm'r Mem."), Docket Entry No. 17.) Plaintiff

failed to oppose the Commissioner's motion.[1] For the reasons set forth below, the

Commissioner's motion for judgment on the pleadings is granted.

---
      [1] After establishing a briefing schedule for the parties' motions for judgment on the
pleadings, the Court granted the parties three extensions of time to file their motions. (Dec. 8,
2014 Order; Feb. 6, 2015 Order; Mar. 18, 2015 Order.) On March 19, 2015, the Commissioner
served her motion on Plaintiff. (Docket Entry No. 13.) On May 19, 2015, the Commissioner
informed the Court that Plaintiff failed to respond to the Commissioner's motion, despite the

## I.  Background

Plaintiff is a forty-three-year-old woman who completed two years of college.  (R. 37, 178.)  Plaintiff last worked on July 7, 2010.  (R. 182.)  Plaintiff applied for disability benefits on April 27, 2011, and alleged a disability onset date of July 7, 2010, due to injuries to her spine, ankles, shoulders and neck.  (R. 178, 182.)  Plaintiff sustained these injuries when a co-worker assaulted Plaintiff on July 7, 2010 (the "July 2010 Assault").  (R. 34.)  Plaintiff's disability benefits application was denied on August 26, 2011, (R. 65), and she timely requested a hearing before an ALJ, which was held on December 17, 2012, (R. 10, 27, 73–74).  On February 22, 2013, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Social Security Act.  (R. 7–21.)  Plaintiff sought review of the ALJ's decision by the Appeals Council.  (R. 5.)  On April 11, 2014, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner.  (R. 1–3.)

### a.  Plaintiff's testimony

Plaintiff last worked as a "crew leader" with the United States Census Bureau.  (R. 33–34, 183, 206.)  Plaintiff stopped working on July 7, 2010 when a co-worker at the census bureau assaulted her.  (R. 33–34.)  That day, while at the co-worker's home, Plaintiff attempted to contact her employer about the co-worker making an illegal request, and when Plaintiff tried to leave, the co-worker began hitting Plaintiff on her head, hip and shoulders with a door.  (R. 33–35.)  Plaintiff escaped, but was in shock and her head "was full of lumps."  (R. 35.)  She went to a hospital for treatment and was told to follow up with her primary care physician.  (*Id.*)

Plaintiff has not returned to work since the assault, and she has numerous ailments.

April 26, 2015 deadline.  (Docket Entry No. 15.)  The Court extended Plaintiff's time to respond to the Commissioner's motion until June 19, 2015.  (June 5, 2015 Order.)  Plaintiff never served or filed a response to the Commissioner's motion.

(R. 36.) Plaintiff experiences vertigo and feels "really dizzy" at times. (*Id.*) During the two years after the assault, Plaintiff could not walk up steps or get out of a bed or chair, and would vomit due to dizziness. (*Id.*) Dr. Timothy Robinson is Plaintiff's primary care physician, and he prescribed Plaintiff "seasickness patches" for her symptoms during those two years. (R. 43.) Plaintiff also has neck and shoulder pain that gives her headaches, and, at the hearing, she complained of being unable to turn her head without pain. (*Id.*) Every day, Plaintiff experiences pain in her left shoulder that radiates throughout her back. (R. 43–44.) Plaintiff also has pain in her left hip. (R. 43.) Plaintiff takes over-the-counter pain medication, but refuses to take painkillers that were prescribed for her. (R. 45.) When Plaintiff complained of excruciating pain, being unable to sit down, get up, or sleep because of her hip pain, she was referred for a magnetic resonance imaging ("MRI") of her hip. (*Id.*) Plaintiff claims that, based on the results the MRI, Ann Marie, who works in Dr. Robinson's office, told Plaintiff she needed a hip replacement. (R. 41, 46.)

Although Dr. Robinson was Plaintiff's primary care provider, Dr. Paul Lerner and his colleague, Dr. Barry Katzman, were initially treating Plaintiff after the July 2010 Assault. (R. 44–45.) Plaintiff testified at the hearing that her last appointment with Dr. Lerner or Dr. Katzman was "[p]robably almost two years [prior]. Maybe a little sooner." (R. 45.) Plaintiff had difficulty obtaining approval for procedures like her hip MRI and treatment of hip pain. (R. 41.) In addition, although doctors have recommended surgical procedures for her spine to address the pain in her shoulders and neck, Plaintiff has been unable to follow up with these doctors. (R. 46.)

Plaintiff has a five-year-old son. (R. 36.) Plaintiff's son's father was abusive after the July 2010 Assault and tried to kidnap their son. (R. 40.) Her son's father also had Plaintiff

arrested in her home. (*Id.*) Due to the ordeal, Plaintiff suffers from anxiety or post-traumatic stress disorder and has received treatment from Dr. Ayelet Goldberg. (R. 40–41.) Plaintiff is "in a constant state of fear" about her pain, people taking her son away, and being killed by her child's father. (R. 47.) Plaintiff does not take medication for her mental health conditions. (R. 48.)

Plaintiff is also the sole caregiver for her son. (R. 36–37.) She takes him to school and helps him with homework, but can no longer take him to the park because if he were to run, Plaintiff would be unable to catch him. (R. 39.) Plaintiff does not engage in many activities during the day — watches television and goes to therapy on her scheduled days. (R. 48.) Plaintiff sometimes stays in her pajamas when she drops her son at school and returns home to lie down due to "excruciating pain." (R. 49.) Plaintiff bathes less frequently than she did before the July 2010 Assault. (*Id.*) Plaintiff performs household tasks like cooking, but her friends "usually" help her clean, as it is not possible for her to clean her house by herself because she is "in way too much pain most days." (R. 37.) Plaintiff can drive a vehicle, but not for long distances, and she is unable to walk more than one block depending on the amount of pain she is experiencing. (R. 38.) Previously, Plaintiff experienced dizziness due to vertigo when she walked long distances, but "not now." (R. 39.) Plaintiff avoids sitting because it causes her pain and numbness. (*Id.*) In an eight-hour day, Plaintiff can sit "[p]robably a couple of hours," stand "[p]robably an hour to an hour and a half," and walk "maybe a few minutes." (R. 57.)

### b. Plaintiff's work history

Plaintiff was a "residences manager" in a group home for developmentally disabled

adults from July of 1994 to December of 1999.[2]  (R. 38, 189, 193.)  Thereafter, Plaintiff owned a

bar and restaurant business.  (R. 38.)  Plaintiff worked as a real estate agent from May of 2003 to

April of 2006.  (R. 183.)  Plaintiff then worked as an "outside sales rep[resentative]" with Office

Depot from March of 2007 to August of 2009, and worked as a "crew leader" for the Census

Bureau from April of 2010 through July of 2010.  (*Id.*)

### c.  Vocational expert testimony

Andrew Vaughan, a vocational expert, described Plaintiff's job as an outside sales

representative at Office Depot as medium and sedentary work with a specific vocational

preparation ("SVP") of "5."  (R. 53.)  He described Plaintiff's work as a residential supervisor as

sedentary work with an SVP of "6."  (*Id.*)  He described Plaintiff's work as a small business

owner of a bar and restaurant as light work with an SVP of "7."  (*Id.*)  According to Vaughn,

accepting Plaintiff's stated limitations, she would not satisfy the Social Security Administration's

("SSA") requirements for an "eight-hour workday of competitive employment," because she

could only stand or sit for a total of six-and-a-half to seven hours.  (R. 57–58.)

### d.  Medical evidence

#### i.  New York Hospital Queens

Plaintiff visited the emergency room at New York Hospital Queens after the July 2010

Assault, and notes signed by Jennifer Yip, P.A. and Dr. Diane M. Sixsmith, M.D, describe

Plaintiff's medical issues at that time.  (R. 223–31.)  Plaintiff presented as the victim of an

assault that had occurred three hours prior to Plaintiff arriving at the emergency room.  (R. 229.)

The assailant grabbed Plaintiff on "BL upper arms, strangled, and hit [Plaintiff] on the head with

---

[2]  At the hearing Plaintiff testified that she had worked with Lifespire, Inc., a "residential facility," however, it is unclear whether Lifesepire, Inc. and the group home where Plaintiff served as a "residences manager" are the same.  (R. 42.)

a door." (*Id.*)  Plaintiff denied losing consciousness or that she had symptoms related to her cardiovascular, respiratory, gastrointestinal, neurological systems or her ear, nose and throat.  (R. 229–30.)  Plaintiff "admit[ted] to neck, upper[] back [pain] and headache."  (R. 223.)

Plaintiff had a regular heart rate and rhythm, and her abdominal area and extremities were "within normal limits."  (R. 230.)  Plaintiff had abrasions and contusions on her left upper arm and abrasions on her "BL neck," in addition to "ecchymosis over the BL upper arms."  (*Id.*)  Plaintiff also had "BL paracervical and shoulder tenderness."  (*Id.*)  The documents indicated that Plaintiff received various medications, including three orders for diazepam, and a tetanus-diptheria toxoid vaccine.  (R. 220–21.)  Plaintiff was directed to follow up with her primary care physician one week later.[3]  (*Id.*)

### ii.  Dr. Timothy Robinson, D.O.

Plaintiff's medical records show that she was seen by Dr. Timothy Robinson multiple times throughout 2010 and 2011, and he referred her for medical imaging throughout that time.

#### 1.  Dr. Robinson's examinations

On or about July 15, 2010, Plaintiff saw Dr. Timothy Robinson for a follow-up appointment in connection with her assault and injuries to her knee, neck and left arm.  (R. 233.)  Dr. Robinson appears to have referred Plaintiff for X-rays, and to have advised her "to avoid work of any kind for the next two weeks, pending her X-[r]ay results and office follow-up."  (*Id.*)  On or about July 27, 2010, X-rays were taken of Plaintiff's cervical spine, left knee, left shoulder

---

[3] There are also notes regarding "Patient Education," stating that Plaintiff was "to rest as much as possible for the next 2 days."  (R. 225–26.)  These notes describe Plaintiff's injury as a contusion to her upper extremity and abrasions, noting that such contusions take "a few days to a few weeks to heal."  (R. 226–27.)

and right ankle.[4]  (R. 235–38.)  Plaintiff's cervical spine showed "straightening of the cervical lordosis,"[5] and had no fractures or subluxations.[6]  (R. 235.)  The prevertebral soft tissues were unremarkable, and "[n]o significant foraminal stenosis [was] seen."[7]  (*Id.*)  The radiologist's impression was "[s]traightening of cervical lordosis," and an "[o]therwise unremarkable examination."  (*Id.*)  A handwritten note on the report indicates "muscle spasm."  (*Id.*)  Plaintiff's left knee showed no fractures, dislocations or joint effusions.  (R. 236.)  The radiologist noted "mild osteoarthritic changes medially with joint space narrowing and small osteophytes."  (*Id.*)  The radiologist's impression was "[m]ild osteoarthritic changes medially."  (*Id.*)  Plaintiff's left shoulder, glenohumeroal and acromioclavicular joints were unremarkable, and her shoulder revealed no fractures or dislocations.  (*Id.*)  Plaintiff's right ankle and ankle mortise were unremarkable, and had no fractures or dislocations.  (R. 238.)

Plaintiff appears to have met with Dr. Robinson again on or about July 29, 2010,[8] complaining of worsening neck pain.  (R. 234.)  Dr. Robinson noted that Plaintiff's X-ray

---

[4]  Dr. Jeffrey C. Lee, M.D. prepared reports of these X-rays and they appear to have been sent to Dr. Robinson.  (R. 235–38.)

[5]  "Lordosis" refers to the increase in "the anterior concavity in the curvature of the lumbar and cervical spine as viewed from the side."  *Lordosis*, *Dorland's Illustrated Medical Dictionary* (29th ed. 2000).

[6]  "Subluxation" refers to "an incomplete or partial dislocation."  *Subluxation*, *Dorland's Illustrated Medical Dictionary*.

[7]  "Foraminal stenosis occurs when the openings, from which nerves exit the spine, narrow.  This condition can cause pain, numbness, or cramping, typically only on one side, which may worsen by standing."  *Yu v. Astrue*, 963 F. Supp. 2d 201, 207 (E.D.N.Y. 2013) (citing PubMed Health, *Spinal Stenosis* (2012), http://www.ncbi.nlm.nih.gov/pubmedhealth/ PMH0001477).

[8]  Dr. Robinson's handwritten notes indicate that he examined Plaintiff at this time.  (R. 234.)

showed "reversal of cervical lordosis," and that Plaintiff was being sent for MRI contrast for

vertigo. (*Id.*) Dr. Robinson prescribed Plaintiff Nasonex "N.S. QD," twenty-five milligrams

meclizine, Cawthorne's Exercises for vertigo, and recommended ten milligrams of Flexeril. (*Id.*)

## 2. MRI results

### A. March 2011 MRIs

Dr. Robinson appears to have referred Plaintiff for an MRI of her cervical spine and left

shoulder, which took place on or about March 17, 2011.[9] (R. 217–18.) Plaintiff's cervical spine

showed reversal of the cervical lordosis, which had its "apex at C4/5."[10] (R. 217.) Plaintiff had

"[d]isc hydration loss at C2/3 through C4/5," and a posterior disc bulge "at C4/5 impresses the

thecal sac and abuts the cord." (*Id.*) There was also a "superimposed posterolateral focal disc

herniation"[11] that was "encroaching into the right anterior recess." (*Id.*) At Plaintiff's "C5/6

level[,] posterior bulging impresse[d] on the thecal sac," and there was a posterior disc bulge at

"C6/7." (*Id.*) The examination detected "no significant protrusions into the neural canal,[12]

recesses or foramina." (*Id.*) The cervical cord was otherwise unremarkable in signal and

morphology, and there was no evidence of "syrinx or Chiara malformation." (*Id.*) Nor were

"focal prevertebral or posterior paraspinal abnormal masses or altered signals . . . noted." (*Id.*)

---

[9] Dr. Steven Winter, M.D. signed the reports of these MRIs and addressed them to Dr. Robinson. (R. 217–18.)

[10] The report lists the cervical spine MRI "technique" as "55 degree tilt" and notes "sagittal T1, sagittal T2, gradient echo axial." (R. 217.)

[11] "Posterolateral" refers to something being "[b]ehind and to one side, specifically to the outer side." *Posterolateral*, *Stedman's Medical Dictionary* (28th ed. 2006).

[12] The "neural canal" refers to a canal "within the neural tube; the primordium of the central c[anal] of [the] spinal cord." *Neural Canal*, *Stedman's Medical Dictionary*.

The MRI of Plaintiff's left shoulder revealed that "the anterior margin of the supraspinatus tendon was inhomogeneous with tendinosis."[13] (R. 218.) There was a "laterally down sloping type II acromial configuration," and a "focus of fluid at both the glenohumeral articulation and the long head of the biceps tendon sheath." (*Id.*) An examination demonstrated that osseous structures of Plaintiff's shoulder were unremarkable in "signal and morphology." (*Id.*) The muscular and tendinous structures including parts of the rotator cuff were "felt to remain" unremarkable in signal and morphology. (*Id.*) In addition, the glenoid labrum appeared unremarkable in position and morphology. (*Id.*)

### B. August 2011 MRIs

Dr. Robinson also appears to have referred Plaintiff for a second series of MRIs on her lumbar spine, hip and left knee, which took place in August of 2011.[14] (R. 259–61.) The MRI of her lumbar spine showed desiccation[15] of all lumbar intervertebral discs, and straightening of the lumbar spine. (R. 261.) There was minimal bilateral facet hypertrophy at the "L4/5 and L5/S1 levels." (*Id.*) The spinal canal was within normal limits in size and there was no evidence of spinal stenosis. (*Id.*) There were no lesions involving the "cauda equine or conus medullaris"[16] or neural foraminal narrowing. (*Id.*) There was also no evidence of loss of height

---

[13] The left shoulder MRI "technique" was "35 degree tilt" and "Axial T1, Axial T2, Coronal/Oblique T2, Sagittal/Oblique T1, Sagittal/Oblique T2." (R. 218.)

[14] Like Plaintiff's prior MRI results, radiologist Dr. Stephen Hershowitz, M.D., signed the report and addressed it to Dr. Robinson. (*Id.*)

[15] "Desiccation" refers to "dehydration" or the process of "desiccating," which is "dry[ing] thoroughly." *Desiccation, Stedman's Medical Dictionary.*

[16] "Cauda equina" refers to the "bundle of spinal roots arising from the lumbosacral enlargement and medullary cone and running through the lumber cistern . . . within the vertebral canal below the first lumbar vertebra; it comprises the roots of all spinal nerves below the first

involving the lumbar vertebral bodies, and the bone marrow demonstrated normal signal intensity. (*Id.*) There were no disc bulges or herniation, intra-dural lesions, or paravertebral soft tissue abnormalities. (*Id.*) The radiologist's impression was "minimal degenerative disease," "straightening of the lumbar spine probably secondary to muscular spasm and/or strain." (*Id.*)

The MRI of Plaintiff's left knee showed thickening of the anterior cruciate ligament, and an unremarkable posterior cruciate ligament. (R. 260.) There was a "Grade II" linear area of increased signal intensity within the posterior horn of the medial meniscus, and the lateral meniscus was unremarkable. (*Id.*) There was minimal joint effusion and minimal fluid in the anserine bursa. (*Id.*) The adipose and muscular planes were well maintained, and the "marrow signal characteristics" of the proximal tibia, proximal fibula, patella and distal femur were within normal limits. (*Id.*) There were no abnormalities involving the infrapatellar and quadriceps tendons. (*Id.*) There was no evidence of thickening or edema within the medial and lateral collateral ligaments, and the articular cartilage demonstrated normal signal intensity and was within normal limits in thickness. (*Id.*) The radiologist's impressions were (1) "medial meniscal degenerative change," (2) "minimal anserine bursitis," (3) "anterior cruciate ligament strain," and (4) "minimal joint effusion." (*Id.*)

The MRI of Plaintiff's left hip showed moderate narrowing of the hip joints "bilaterally," and indicated that there was a minimal cyst within the lateral aspect of the right femoral head. (R. 259.) There were several physiological cysts within the ovaries bilaterally. (*Id.*) The femoral heads, necks and proximal shafts demonstrate normal cortical signal voids with no evidence of flattening or disruption, and there was no evidence of avascular necrosis. (*Id.*) In

---

lumbar." *Cauda Equina*, *Stedman's Medical Dictionary*. "Conus medullaris" refers to the "tapering lower extremity of the spinal cord." *Conus medullaris*, *Stedman's Medical Dictionary*.

addition, the "[m]arrow signal characteristics in the proximal femora, ischium, pubic and iliac bones [were] within normal limits." (*Id.*) The radiologist's impressions were "bilateral hip joint degenerative disease" and "minimal right femoral head cyst." (*Id.*)

### iii. Dr. Paul Lerner, P.D., P.C. and Dr. Barry Katzman, M.D.

In 2010, Plaintiff saw Dr. Paul Lerner and Dr. Barry Katzman, of the same office,[17] multiple times, including on or about August 2, 2010 and on November 3, 2010. (R. 208, 215, 240.)

### 1. August 2, 2010 examination

Plaintiff visited Dr. Lerner on August 2, 2010, and complained of ailments that began after the July 2010 Assault. (R. 208–14.) Plaintiff complained of dizziness, headaches and pain in her lower back, neck, left knee and right ankle, which included constant pain in her neck and back that worsened when Plaintiff bent down. (R. 209.) Plaintiff's neck pain radiated into the right and left shoulders "toward both the right and left scapula." (*Id.*) Plaintiff reported that her knee pain was worse when walking on stairs, and that she was experiencing intermittent tingling in her left hand. (*Id.*) Plaintiff denied being physically weak, but indicated that she was "actively limited by [her] pain." (*Id.*) Plaintiff complained of dizziness, nausea, memory loss and difficulty concentrating and reading. (*Id.*) Dr. Lerner noted that Plaintiff's description of dizziness was "consistent with vertigo," and that Plaintiff's headaches were "posterior and frontal in location and squeezing in character," and that they were less severe in the mornings but that they increased throughout the day. (*Id.*) Dr. Lerner reviewed Plaintiff's "systems," and

[17] The records from Dr. Lerner and Dr. Katzman reflect the same office address: 1575 Hillside Avenue, Suite 100, New Hyde Park, New York. (R. 215, 240.)

reported "[n]o abnormal findings with the exception of [Plaintiff's] chief complaint."[18] (*Id.*)

Dr. Lerner completed a physical examination of Plaintiff and noted that the "[a]ctive range of motion at [Plaintiff's] cervical and lumbar spine . . . reveal[ed] a moderate degree of restriction in all directions associated with [Plaintiff's] complaints of pain." (R. 241.) Plaintiff had "Tinel's sign" at her left wrist,[19] and she reported discomfort with "percussion of the spine and palpation of the paravertebral muscles." (*Id.*) Plaintiff's right ankle was also tender. (*Id.*) Plaintiff's pulse was strong and regular, and Dr. Lerner did not hear "bruits." (*Id.*) An otoscopic examination found "cerumen partially obscuring the tympanic membrane." (*Id.*)

Plaintiff's higher cognitive functions were "grossly intact. MMSE 30/30." (*Id.*) Plaintiff's olfaction was normal, her pupils were equal and reactive, and her visual fields were full and her funduscopic examination was normal. (*Id.*) Plaintiff's extraocular muscle function was normal without "nystagmus," and the muscles of mystification were strong. (*Id.*) Plaintiff had normal facial sensation and her corneal reflexes were present. (*Id.*) Dr. Lerner noted that Plaintiff's hearing was "grossly intact," and that the "accessory muscles [were] strong." (*Id.*)

Dr. Lerner examined Plaintiff's motor skills, noting that Plaintiff's muscle strength was "5/5 for all groups tested," and that he found no fasciculation, tremors, or dysmetria. (R. 241–42.) Plaintiff had normal muscle tone in her extremities, but there was muscle spasm present "at the thoracolumbar paraspinal muscles and cervical paraspinal muscles." (R. 242.) Plaintiff's deep tendon reflexes were normal and symmetric, and pathological "myelopathic" reflexes were

---

[18] Plaintiff also complained of having a loose upper dental bridge, and anxiety due to her assault. (R. 209.)

[19] "Tinel's sign" refers to a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve," and indicating "a partial lesion or the beginning regeneration of the nerve." *Tinel's Sign*, *Dorland's Illustrated Medical Dictionary.*

absent.  (*Id.*)  She had an antalgic[20] gait, and her "Romberg's test" was "equivocal."  (*Id.*)  Dr.

Lerner concluded that Plaintiff had an "absent response to right auditory stimulation," and

recommended "correlation with imaging and audiology[.]"  (R. 212.)

Dr. Lerner's impressions were that Plaintiff had cervical "radiculitis,"[21] lumbar strain,

left knee strain, right ankle pain, post-concussion syndrome with post-traumatic vertigo, anxiety,

left median nerve entrapment at the wrist and dental injury.  (R. 210.)  He recommended an MRI

of the cervical spine to evaluate for structural abnormality such as intervertebral disk herniation,

an MRI to evaluate structural abnormality such as subdural hematoma and contusion, and an

electro encephalogram ("EEG") to evaluate for electro-cortical disturbance.  (*Id.*)  Plaintiff's

"[b]rainstem auditory evoked response testing will be obtained to evaluate vestibular-cochlear

d[y]sfunction and VIIJ nerve integrity."  (*Id.*)  Dr. Lerner concluded that "[Plaintiff] is totally

disabled."  (*Id.*)

### 2.  November 3, 2010 examinations

On or about November 3, 2010, Dr. Lerner completed an "Attending Physician's Report"

form from the U.S. Department of Labor, Employment Standards Administration Office of

Workers' Compensation Programs and attached his August 2, 2010 medical report and a

November 3, 2010 medical report.[22]  (R. 240–43.)  On the form, Dr. Lerner referenced the

August 2, 2010 medical report multiple times, but also added handwritten notes.  (R. 240.)  Dr.

---

[20]  Antalgic refers to "analgesic."  *Antalgic, Dorland's Illustrated Medical Dictionary*.
Analgesic means "not sensitive to pain."  *Analgesic, Dorland's Illustrated Medical Dictionary*.

[21]  "Radiculitis" refers to "inflammation of the root of a spinal nerve, especially that of
that portion of the root which lies between the spinal cord and the intervertebral canal."
*Radiculitis, Dorland's Illustrated Medical Dictionary*.

[22]  The November 3, 2010 medical report includes the complete August 2, 2010 medical
report.  (*See* R. 209–10, 241–43.)

Lerner noted that Plaintiff had no history or evidence of concurrent or pre-existing injury, disease or physical impairment. (*Id.*) He also noted that her current physical ailments were caused or aggravated by an employment activity, but did not explain this answer in the space provided on the form, and he indicated that the injury required emergency room treatment. (*Id.*) Dr. Lerner noted that Plaintiff had a "period of total disability" from July 7, 2010 to November 3, 2010, "and beyond." (*Id.*) Dr. Lerner listed "N/A" for the date Plaintiff could resume light work, and "unknown" for the date Plaintiff could resume regular work. (*Id.*) He noted that Plaintiff had not been advised that she could not return to work, but noted that permanent effects are expected as a result of the injury. (*Id.*) His handwritten notes appear to state that "[a]bnormal brainstem evoked response," and that Plaintiff needed an MRI of her brain and cervical spine. (*Id.*)

Dr. Lerner included a short report of Plaintiff's November 3, 2010 examination. (R. 243.) According to the report, Plaintiff still "suffer[ed] from neck pain, headache, and dizziness." (*Id.*) She also had some knee and back pain, and there had been "[n]o significant change" for her prior appointments. (*Id.*) Although the medication Antivert helped Plaintiff with her dizziness, it was sedating. (*Id.*) A neurological exam did not reveal new focal deficits, but "BAER reveals conduction abnormality on the right." (*Id.*) Dr. Lerner assessed Plaintiff as having post-concussion syndrome, post-traumatic vertigo, cervical radiculitis, lumbar strain, let knee strain, anxiety, dental injury, ankle pain and "CTS." (*Id.*) He included recommendations similar to those of his August 10, 2010 report, specifically "Cranial/IAC" imaging by MRI with contrast to evaluate for structural abnormality, including subdural hematoma and contusion, and an MRI of the cervical spine to evaluate for structural abnormalities including intervertebral disk herniation. (*See* R. 210, 243.) He recommended an orthopedic follow up and prescribed 12.5

milligrams of Antivert "tid prn." (*Id.*)  Dr. Lerner noted that "[a]ny further diagnostic testing and/or treatment should depend on her clinical course and the results of the above." (*Id.*)

On the same day, Dr. Barry Katzman completed an "Attending Physician's Report."[23] (R. 215–16.)  Dr. Katzman noted that Plaintiff's injury arose from her "boss" assaulting her and injuring Plaintiff's neck, knee and ankle.  (R. 215.)  Plaintiff had swelling, tenderness and subjective pain, but Dr. Katzman noted that there were "no MRI's approved yet," "no definitive dx"[24] and that Plaintiff's X-rays were normal. (*Id.*)  Dr. Katzman believed that Plaintiff's condition was caused or aggravated by an employment activity.  (*Id.*)  He noted that Plaintiff "remains totally disabled pending further evaluation," and that the "period of total disability" was July 30, 2010 to "present."  (*Id.*)  He indicated that it was "[u]nknown" when Plaintiff would be able to resume regular or light duty work, and he did not advise Plaintiff that she could return to work.[25]  (*Id.*)

### iv.  Dr. Iqbal Teli, M.D.

On or about June 29, 2011, Plaintiff visited Dr. Iqbal Teli, M.D., of Industrial Medical Associates, P.C., for an internal medicine examination based on a referral from the Division of Disability Determination.  (R. 250–53.)  Plaintiff complained of experiencing sharp knee pain throughout the prior year, which Plaintiff rated as "9/10" in intensity, and which occurred when she climbed up and down stairs.  (R. 250.)  Plaintiff also complained of having sharp pain in her

---

[23]  Dr. Katzman noted that he is an "ortho" specialist, and that he performed an "ortho eval follow up."  (R. 215.)

[24]  The Commissioner submits that Dr. Katzman's shorthand of "no definitive dx" means "no definitive diagnosis."  (Def. Mem. 17.)

[25]  A "Disability Worksheet" relating to Plaintiff's claim identifies Dr. Katzman as a "treating source," but states that he "did not respond to our requests."  (R. 262.)

left hip continuously every day throughout the prior year, which Plaintiff rated as "10/10" in intensity, and which radiated to Plaintiff's left lower extremity and caused numbness in her toes. (*Id.*)  Plaintiff's knee and hip pain was described as "secondary to injury."  (*Id.*)  Plaintiff's current medication was noted as 12.5 milligrams of meclizine "p.r.n. dizziness."  (*Id.*)  Dr. Teli noted that Plaintiff cooks once or twice a week, showers and dresses daily, and watches television.

Dr. Teli noted that Plaintiff "appeared to be in no acute distress" and had a normal gait. (R. 251.)  He further noted that Plaintiff could not walk on her toes "comfortabl[y]," and listed her squat at "80% due to knee pain."  (*Id.*)  Dr. Teli also noted that Plaintiff's stance was normal, she used no assistive devices, she needed no help changing for the examination or getting on and off of the examination table, and she was able to rise from her chair without difficulty.  (*Id.*)  Dr. Teli noted no significant adenopathy when examining Plaintiff's skin and lymph nodes, and noted that her head was normocephalic and atraumatic.  (*Id.*)  Dr. Teli noted that Plaintiff's ears, nose and throat were normal, and noted some teeth "with capping."  (*Id.*)

Dr. Teli made various observations about Plaintiff's musculoskeletal system.  He noted that Plaintiff's cervical and lumbar spine showed "full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally."  (*Id.*)  Plaintiff had "[n]o scoliosis, kyphosis, or abnormality in [her] thoracic spine."  (*Id.*)  In addition, Plaintiff's "SLR" was negative bilaterally, and she had full range of motion in her shoulders, elbows, forearms, wrists, hips, knees and ankles bilaterally.  (*Id.*)  Dr. Teli found no evident "subluxations, contractures, ankyloses or thickening," and Plaintiff's joints were stable and non-tender with no redness, heat, swelling, or effusion.  (R. 251–52.)  Plaintiff's pain and touch sensation was diminished in her left leg, and her pain sensation was diminished in her left hand.  (R. 252.)  He noted that

Plaintiff's strength was "5/5" in the upper and lower extremities.  (*Id.*)  Plaintiff's X-rays indicated that her lumbosacral spine and ankle were normal.[26]  Based on these findings, Dr. Teli diagnosed Plaintiff as having a history of left knee and hip pain, but he gave Plaintiff a "stable" prognosis.  (*Id.*)  Dr. Teli noted that Plaintiff had "a mild restriction for squatting."  (*Id.*)

### v.  Other medical evidence

#### 1.  July 2011 X-rays

In July of 2011, Plaintiff's lumbosacral spine and left ankle were X-rayed.  Two radiology reports from Industrial Medicine Associates Disability Services, signed by radiologist Lawrence S. Liebman, M.D, detail the results of these X-rays.[27]  (R. 254–55.)  "The height of the vertebral bodies and intervertebral disc spaces [was] relatively well maintained" and "[t]he pedicles [were] intact throughout."  (R. 254.)  Dr. Liebman's impression was of a "negative study."  (*Id.*)  Plaintiff's left ankle had "no evidence of acute fracture, dislocation or destructive bony lesion," and the joint spaces were "relatively well maintained."  (R. 255.)  Dr. Liebman noted that his impression was of a negative radiographic examination of the left ankle.  (*Id.*)

#### 2.  September 2010 dental claim

Plaintiff had her teeth examined by Dr. Sheldon Blumberg, D.M.D., and a "Dental Claim Form" dated September 8, 2010, lists five procedures that were performed on Plaintiff's teeth.  (R. 239.)  The procedures are described as "[p]orcelain fused to high noble metal" for three of Plaintiff's teeth, and "pontic-porcelain to high noble" for two other teeth.  (*Id.*)

---

[26]  It is unclear whether Dr. Teli obtained new X-rays of Plaintiff's spine and ankle, or if Dr. Teli reviewed prior X-rays in completing his report.

[27]  These examinations appear to have been completed in connection with Plaintiff's consultative physical examination with Industrial Medicine Associates.  (R. 256–57.)

### 3. Jewish Board of Family and Children's Services, Inc.

In or about April of 2012, Plaintiff received psychology-related treatment at the Jewish Board of Family and Children's Services, Inc. ("JBFCS"). (R. 270–292.) Michael Greene, L.C.S.W. assessed Plaintiff. (R. 292.) At the time, Plaintiff complained that her son had been kidnapped by Plaintiff's boyfriend and returned after four weeks. (R. 270.) Plaintiff sought ways to relate to her son and answer questions regarding the ordeal. (*Id.*) Plaintiff presented with anxiety, depressive disorders and trauma, and she was "very distressed at [the] situation." (R. 270–71.) Plaintiff denied having any prior inpatient treatment. (R. 271.) Plaintiff described her "tumultuous relationship" with her son's father, including domestic violence, emotional abuse, assaults by his family members, and a fabricated assault claim that resulted in Plaintiff's arrest. (R. 270.) Plaintiff believed that her son's father had been using her friends and family to persecute her. (R. 287.) Plaintiff sought family and one-on-one therapy. (R. 288.)

Plaintiff reported a number of physical and psychological symptoms related to the July 2010 Assault. (R. 272.) Plaintiff complained of significant hip pain and indicated that she was planning to undergo a hip replacement. (*Id.*) Plaintiff also experienced tingling in her hand, back pain, "brooding/worry/regrets" regarding "past behavior /experience/decisions," and worries about "adequacy/worthiness/failures," and difficulty controlling worries. (R. 274.) Greene noted that Plaintiff suffered from self-blame, "guilty/worthlessness," "racing thoughts," "distractibility (easily drawn to unimportant stimuli)," psychomotor agitation, rapid "and/or" pressured speech, increased goal directed activity, and poor judgment regarding work, relationships, and money. (*Id.*) Plaintiff also had post-traumatic symptoms, including recurrent dreams of a traumatic event, nightmares, flashbacks, intensive psychological distress in response to reminders and physical reactions to reminders. (R. 274–75.) As to "avoidance" and "arousal"

phenomena, the noted symptoms include avoiding people, places, and thoughts, along with hypervigilance.  (R. 275.)

Plaintiff had "no evident" level of suicide risk, and her risk of homicide or violent aggression was noted as low, and with "passive (thoughts of death)."  (R. 278.)  As to trauma, Plaintiff's risk level was high due to Plaintiff being a direct "victim/perpetrator" of physical, sexual, and "emotional/verbal" abuse, neglect, domestic violence, and "other traumatic event." (R. 278–79.)  At the time of the evaluation, Plaintiff was employed part time as a "sober chaperone," which was "good as [Plaintiff] is also starting a nonprofit organization against domestic violence."  (R. 281.)  According to the notes, Plaintiff was "satisfied with [her] employment status."[28]  (Id.)

Plaintiff appeared to be her stated age, was overweight, was dressed casually,[29] made steady eye contact and was cooperative and engaging, but also agitated.  (R. 285.)  Her movements, mannerisms, posture and gait were comfortable, and she was articulate, expressive, and spoke at an "appropriate" volume and rate.  (Id.)  Plaintiff's appearance and behavior was "generally appropriate although not quite right for the setting."[30]  (Id.)  Greene noted that Plaintiff was "a bit kinotic, perhaps due to lack of sleep."  (Id.)  Plaintiff had a neutral "euthymic" emotion, a "full" affect, and appropriate affect intensity, relation content, and reactivity.  (Id.)  Her thoughts were organized, and she had no hallucinations, misperceptions or delusions.  (Id.)

---

[28]  Plaintiff did not testify about having this position during her administrative hearing on her disability benefits claim.

[29]  Greene noted that Plaintiff's attire was "more suited for a social interaction than an interview."  (R. 281.)

[30]  Plaintiff stated she was "brought to jail the previous night."  (Id.)

A "Diagnostic Review" lists Greene's diagnoses. (R. 291.) Plaintiff's clinical syndromes were "Adjust D/O W mixed anxiety." (*Id.*) Developmental or personality disorders were noted as "[n]o diagnosis on Axis I or II." (*Id.*) Plaintiff "denie[d] any physical disorders/conditions," and as to stressors, Greene noted interaction with the legal system and problems with Plaintiff's primary support group. (*Id.*) Greene's diagnostic impressions were "R/O Axis I – Bi-polar" and "R/O Axis II Borderline." (*Id.*) Greene lists "discharge criteria" of "client's anxiety is reduced by 50%. Child is able to articulate concerns about parents, mother has approach to minimize emotional strain on child." (R. 289.) Regarding treatment, Greene recommended "outpatient treatment — JBFCS." (*Id.*) He noted that Plaintiff was in agreement with the treatment plan, and they discussed "how to manage what [Plaintiff] believes are physical threats being made against her." (R. 290.)

### e. Non-medical evidence

#### i. Residual functional capacity assessment

Plaintiff's records include a July 2011 physical residual functional capacity assessment conducted by the SSA, which is signed by "C. Mullins." (R. 244–49.) Plaintiff's primary diagnosis was a back disorder and her secondary diagnosis was a bilateral ankle injury. (R. 244.) The report states that Plaintiff can occasionally lift or carry twenty pounds, frequently lift or carry ten pounds, and sit, stand "and/or" walk with normal breaks for "about" six hours in an eight hour workday. (R. 245.) In addition, Plaintiff can push "and/or" pull, including operation of hand "and/or" foot controls "unlimited, other than as shown for lift and/or carry." (*Id.*) The report notes that Plaintiff can "occasionally" climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. (R. 246.) No manipulative, visual, communicative or environmental limitations were noted. (R. 246–47.)

For support as to the limitations and findings, the report states:

> 38 [year old] cl[aimant] alleges disability due to spine injury, ankle injury bilaterally, and bilateral shoulder injury as well as neck problems. Gait/stance normal. [Claimant] cannot walk on toes. [Can] squat 80% due to knee pain. Used no assistive devices. [Claimant is] able to rise from chair without difficulty. [Full range of motion in] cervical spine, lumbar spine, shoulders, elbows, wrists, hips, knees and ankles. SLR negative. Joints stable and nontender. No swelling or redness. DTRS equal in UE/LE pain and touch sensation diminished in left leg and pain sensation diminished in left hand. Strength 5/5. No edema or muscle atrophy. Pulses physiologic and equal. Grip strength 5/5. X-ray lumbar spine is normal study as well as left ankle X-ray. MRI of cervical spine shows no significant protrusion into neural canal and cervical cord is unremarkable. MRI [of] left shoulder is unremarkable. Based on evidence in file. Cl[aimant] can function as described in A1-5.

(R. 245.) As to symptoms, the report notes that Plaintiff stated she cooks once or twice a week, has no problems with personal care, and spends most days watching television. (R. 247.) In addition, the report notes that Plaintiff's statements appear "partially credible" and were used to assess Plaintiff's residual functional capacity. (*Id.*)

The report notes that there was treating source information in Plaintiff's file that was "significantly different" from the report's findings. (R. 248.) The file notes the opinions of Dr. Robinson and Dr. Lerner, assigns little weight to Dr. Robinson's opinion that Plaintiff should avoid work for two weeks based on the totality of evidence in her file, and finds that Dr. Lerner's opinion that Plaintiff was totally disabled was "reserved for the [Social Security Administration] Commissioner." (R. 248.)

**f.   The ALJ's decision**

The ALJ conducted the five-step sequential analysis as required by the Social Security Administration under the authority of the Social Security Act. First, the ALJ found that Plaintiff had not engaged in substantial activity since July 7, 2010, the alleged onset date. (R. 12.)

Second, the ALJ found that Plaintiff had the following severe impairments: "degenerative disc disease of the cervical and lumbar spines; obesity; degenerative changes of the left shoulder with tendinosis; bilateral hip degenerative joint disease; degenerative changes of the left knee; and vertigo." (*Id*.) The ALJ found that these impairments "cause more than minimal limitations in the [Plaintiff's] ability to perform basic work activities and are therefore severe." (*Id*.) Third, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or are medically equal to the severity of one of the listed impairments in Appendix 1 of the Social Security Regulations. (R. 14.) The ALJ considered Listing 1.00 for the musculoskeletal system, Listing 11.00, for neurological, Listing 12.00 for mental impairments, and considered the additional cumulative effects of Plaintiff's obesity under Social security Regulation 02-1p. (*Id*.)

Regarding Listings 1.00, 11.00 and 12.00, the ALJ found that Plaintiff's condition does not meet or medically equal these Listing's criteria, or any impairment in Appendix 1 of the Social Security Regulations. (*Id*.) With respect to the cumulative effects of Plaintiff' obesity, the ALJ found that the record did not show that the obesity caused "discrete functional effects of disability . . . ." (*Id*.) The ALJ further found that the medical reports referencing Plaintiff's weight "did not include specific limitations associated with that weight," so that when Plaintiff's obesity is factored with other impairments, "significant limitations are warranted yet with the record failing to support restrictions precluding the range of work described below." (*Id*.)

Fourth, the ALJ determined that Plaintiff "has the residual functional capacity to perform a substantial range of sedentary work," noting that Plaintiff "is limited to no more than frequent reaching with the upper extremities; and she is unable to work at high exposed places, or in proximity to moving mechanical parts." (R. 15.) The ALJ also determined that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are

inconsistent with the evidence, including clinical findings and objective testing." (R. 19.) In reaching this conclusion, the ALJ recounted Plaintiff's medical history following her assault at work in July 2010. (R. 15.) The ALJ accorded considerable weight to the opinions of Dr. Robinson and Dr. Teli. (R. 20.) As to Dr. Robinson, the ALJ noted that although Dr. Robinson reasonably concluded that Plaintiff required two weeks off from work after her July 2010 injury, his records did not reflect "an inability to work for any vocationally relevant period," as the records showed limited findings and treatment, and subsequently found "reversal of the cervical lordosis." (*Id.*) As to Dr. Teli, the ALJ found that he was an examining source with an appropriate expertise whose "opinions [were] consistent with his clinical findings." (*Id.*) However, the ALJ did not accord Dr. Teli "great weight" because "evidence received at the hearing level support[ed] greater limitations, based on the totality of the evidence." (*Id.*) The ALJ also noted the findings of the "Disability Determination Services," showing that Plaintiff was capable of light work, but assigned "no weight" to their opinion as it was rendered by an analyst and not a medical doctor. (*Id.*) The ALJ also assigned "very limited weight" to Plaintiff's workers' compensation current and future benefits payments based on her claim. (*Id.*)

Finally, the ALJ determined that based on Plaintiff's residual functional capacity, Plaintiff is capable of performing past relevant work as a residential supervisor, as that position does not require activities beyond Plaintiff's residual functional capacity. (R. 20–21.)

## II. Discussion

### a. Standard of review

"In reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), *as amended on reh'g in part*,

416 F.3d 101 (2d Cir. 2005); *see also Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (per curiam). "Substantial evidence is 'more than a mere scintilla' and 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greek v. Colvin*, --- F.3d ---, ---, 2015 WL 5515261, at *3 (2d Cir. Sept. 21, 2015) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *McIntyre v. Colvin*, 758 F.3d 146, 149 (2d Cir. 2014) (same). Once an ALJ finds facts, the court "can reject those facts only if a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin.*, 683 F.3d 443, 448 (2d Cir. 2012) (citation and internal quotation marks omitted). In deciding whether substantial evidence exists, the court "defer[s] to the Commissioner's resolution of conflicting evidence." *Cage v. Comm'r of Soc. Sec.*, 692 F.3d 118, 122 (2d Cir. 2012); *McIntyre*, 758 F.3d at 149 ("If evidence is susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld."). The Commissioner's factual findings "must be given conclusive effect so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotations omitted). If, however, the Commissioner's decision is not supported by substantial evidence or is based on legal error, a court may set aside the decision of the Commissioner. *Box v. Colvin*, 3 F. Supp. 3d 27, 41 (E.D.N.Y. 2014); *see Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998). "In making such determinations, courts should be mindful that '[t]he Social Security Act is a remedial statute which must be "liberally applied;" its intent is inclusion rather than exclusion.'" *McCall v. Astrue*, No. 05-CV-2042, 2008 WL 5378121, at *8 (S.D.N.Y. Dec. 23, 2008) (alteration in original) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 723 (2d Cir. 1983)).

**b. Availability of benefits**

Federal disability insurance benefits are available to individuals who are "disabled" within the meaning of the Act. To be eligible for disability benefits under the Act, the plaintiff

must establish his or her inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be of "such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). The Commissioner has promulgated a five-step analysis for evaluating disability claims. 20 C.F.R. § 404.1520. The Second Circuit has described the steps as follows:

> The first step of this process requires the [Commissioner] to determine whether the claimant is presently employed. If the claimant is not employed, the [Commissioner] then determines whether the claimant has a "severe impairment" that limits her capacity to work. If the claimant has such an impairment, the [Commissioner] next considers whether the claimant has an impairment that is listed in Appendix 1 of the regulations. When the claimant has such an impairment, the [Commissioner] will find the claimant disabled. However, if the claimant does not have a listed impairment, the [Commissioner] must determine, under the fourth step, whether the claimant possesses the residual functional capacity to perform her past relevant work. Finally, if the claimant is unable to perform her past relevant work, the [Commissioner] determines whether the claimant is capable of performing any other work. If the claimant satisfies her burden of proving the requirements in the first four steps, the burden then shifts to the [Commissioner] to prove in the fifth step that the claimant is capable of working.

*Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996)).

### c. Analysis

The Commissioner moves for judgment on the pleadings, arguing that the ALJ properly considered the medical evidence of Plaintiff's treating physicians, and properly found that

Plaintiff had the residual functional capacity ("RFC") to perform a substantial range of sedentary work and properly assessed Plaintiff's credibility. (Comm'r Mem. 11–20.) Although Plaintiff never opposed the motion, the Court has conducted a thorough review of the record in deciding the motion.

### i. Treating physician

A treating physician's opinion on the "nature and severity" of the plaintiff's impairments will be given "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the plaintiff's] case record." 20 C.F.R. § 404.1527(c)(2); *see also Matta v. Astrue*, 508 F. App'x 53, 57 (2d Cir. 2013) (discussing the treating physician rule); *Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place[s] him in a unique position to make a complete and accurate diagnosis of his patient." (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1039 n.2 (2d Cir. 1983) (per curiam))). A treating source is defined as a plaintiff's "own physician, psychologist, or other acceptable medical source" who has provided plaintiff "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the plaintiff]." 20 C.F.R. § 404.1502; *see also Bailey v. Astrue*, 815 F. Supp. 2d 590, 597 (E.D.N.Y. 2011).

An ALJ must consider various factors in determining how much weight to give a treating physician's opinion. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (citing 20 C.F.R. § 404.1527(d)(2)). Specifically, the ALJ should consider: "(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is

a specialist." *Selian*, 708 F.3d at 418 (citing *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)); *see also Halloran*, 362 F.3d at 32 (discussing the factors).  The ALJ must set forth the reasons for the weight he or she assigns to the treating physician's opinion.  *Halloran*, 362 F.3d at 32.  The ALJ is not required to explicitly discuss the factors, but it must be clear from the decision that the proper analysis was undertaken.  *See Petrie*, 412 F. App'x at 406 ("[W]here 'the evidence of record permits us to glean the rationale of an ALJ's decision, we do not require that he have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" (quoting *Mongeur*, 722 F.2d at 1040)).  Failure "to provide good reasons for not crediting the opinion of a claimant's treating physician is a ground for remand." *Sanders v. Comm'r of Soc. Sec.*, 506 F. App'x 74, 77 (2d Cir. 2012); *see Halloran*, 362 F.3d at 32–33.

Here, the ALJ accorded the opinion of Plaintiff's treating physician, Dr. Robinson, considerable weight.  (R. 20.)  Dr. Robinson found that Plaintiff needed to avoid working for two weeks, however, it is unclear whether this opinion reflects Dr. Robinson's belief that Plaintiff was physically unable to work during that time.  (R. 233.)  The ALJ properly considered the record evidence and assigned considerable weight to Dr. Robinson's opinion, noting that avoiding work for two weeks was reasonable given the pending examination and diagnostic testing.  (R. 20.)  The ALJ also properly considered Dr. Robinson's treatment records to conclude that Plaintiff had no inability "to work for any vocationally relevant period." (*Id.*) Indeed, after recommending that Plaintiff avoid work for two weeks, Dr. Robinson's follow-up opinions do not reflect any physical limitations or recommendations for Plaintiff to avoid particular activities, including working.  Rather, as the ALJ noted, Dr. Robinson's course of treatment was conservative, prescribing medication for pain and dizziness, recommending

"Cawthorne's Exercises" for dizziness, and referring Plaintiff for an MRI to evaluate her vertigo. (R. 234.) The ALJ properly evaluated and assigned considerable weight to Dr. Robinson's opinion.

The ALJ also properly considered the opinions of Dr. Lerner and his colleague Dr. Katzman, and properly assigned Dr. Lerner's opinion little weight. (R. 16.) Dr. Lerner's August 2, 2010 examination found that Plaintiff had "5/5" muscle strength for the groups he tested, but he found tenderness at Plaintiff's right ankle and "a moderate degree of restriction" in Plaintiff's cervical and lumbar spine consistent with Plaintiff's complaints of pain. (R. 16, 209.) Ultimately, Dr. Lerner concluded that Plaintiff was "totally disabled." (R. 210.) Thereafter, Dr. Lerner and his colleague, Dr. Katzman, both examined Plaintiff on November 3, 2010,[31] and Dr. Katzman concluded that Plaintiff "remained totally disabled pending further evaluation." (R. 215.) Dr. Lerner found that Plaintiff's condition was the same as he found in August, noting that Plaintiff's subjective symptoms of "some knee and back pain," and recommending further imaging. (R. 243.)

Dr. Lerner's and Dr. Katzman's finding as to Plaintiff's "total disability" were properly ignored by the ALJ as those disability determinations are reserved for the Commissioner. 20 C.F.R. § 404.1527; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003) ("A treating physician's statement that the claimant is disabled cannot itself be determinative." (quoting *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)); *Micheli v. Astrue*, 501 F. App'x 26,

---

[31] The ALJ does not recount the findings from Plaintiff's appoints in November of 2010, but Dr. Lerner's examination notes are part of "Exhibit 6F" and Dr. Katzman's notes are part of "Exhibit 1F," both of which the ALJ referenced in his determination. (*See* R. 16); *Tilles v. Comm'r of Soc. Sec.*, No. 13-CV-6743, 2015 WL 1454919, at *3 (S.D.N.Y. Mar. 31, 2015) ("As the Report noted, the ALJ referenced the FEGS records, which contained the opinions of Drs. Shuja and Pringle, several times in his decision.").

28 (2d Cir. 2012) (same). Moreover, these conclusions were inconsistent with the clinical findings and other record evidence. As discussed above, Plaintiff's MRIs in 2010 and 2011 reflected limited findings of posterior disc bulging and straightening of Plaintiff's cervical and lumbar spine, and prompted only conservative treatment by Plaintiff's treating physician, Dr. Robinson. Moreover, Dr. Lerner and Dr. Katzman's own findings contradict their conclusions. Dr. Lerner found that Plaintiff had perfect muscle strength and only a moderate degree of restriction in her cervical and lumbar spine. (R. 209.) Further, Dr. Lerner also found that Plaintiff's deep tendon reflexes were "normal and symmetric," and the muscle tone in her extremities was also normal. (R. 210.) Dr. Katzman, noted that he lacked any MRIs, but found Plaintiff's X-rays were "normal," and he could make "no definitive d[iagnosis]." (R. 215.) In view of their findings and the objective medical evidence, the ALJ properly rejected these opinions, and accorded Dr. Lerner's opinion little weight given the medical record.[32]

The ALJ considered the opinion of the analyst from Disability Determination Services, who found that Plaintiff was capable of "light work." (R. 20, 244–49.) The ALJ, however, assigned the analyst's opinion "no weight" because the analyst was not a medical doctor, and the record evidence demonstrated that Plaintiff had greater limitations than noted by the analyst. Because the analyst is not a medical source, the ALJ properly accorded the analyst's opinion no

---

[32] The ALJ does not explicitly mention Dr. Lerner's November 3, 2010 "Attending Physician Report," which also stated that Plaintiff was disabled. (R. 240.) However, as with Dr. Lerner's August 3, 2010 opinion that Plaintiff was "totally disabled," this opinion was not entitled to controlling weight, because it is a decision reserved for the Commissioner. 20 C.F.R. § 404.1527; *see also Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). Moreover, Dr. Lerner relied almost exclusively on his August 3, 2010 findings, which the ALJ explicitly considered and rejected. While Dr. Lerner included a November 3, 2010 note, those findings were consistent with the ALJ's determination, finding that Plaintiff continued to have "some knee and back pain," and, like Dr. Robinson, recommended a conservative treatment plan. (R. 243.)

weight. *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 n.10 (E.D.N.Y. 2010) ("The only complete RFC opinion in the file was filled out by R. Arnold, a DDS disability analyst, who is apparently not a doctor, and whose opinions are not entitled to any medical weight."); *Campbell v. Astrue*, 713 F. Supp. 2d 129, 139 (N.D.N.Y. 2010) ("The opinions of a disability analyst, who has no medical training, are not entitled to evaluation as medical opinions."); *Hopper v. Comm'r of Soc. Sec.*, No. 06-CV-0038, 2008 WL 724228, at *10 (N.D.N.Y. Mar. 17, 2008) ("The ALJ did not err in making this finding as a disability analyst is not considered to be an acceptable medical source under the Regulations."). Accordingly, the ALJ's assignments of weight were proper and do not warrant remand.

### ii. The ALJ properly determined Plaintiff's RFC

The Commissioner argues that the ALJ's finding that Plaintiff's RFC was sufficient to perform a substantial range of sedentary work was supported by substantial evidence in the record. (Def. Mem. 14–15.) According to the Commissioner, both the medical opinions and objective medical evidence support the RFC assessment. (Def. Mem. 14–15.)

In determining a claimant's RFC, "[t]he Commissioner must consider objective medical evidence, opinions of examining or treating physicians, subjective evidence submitted by the claimant, as well as the claimant's background, such as age, education, or work history." *Stover v. Astrue*, No. 11-CV-172, 2012 WL 2377090, at *6 (S.D.N.Y. Mar. 16, 2012) (citing *Mongeur*, 722 F.2d at 1037). A RFC determination specifies the "most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 404.1545. With respect to a claimant's physical abilities, a RFC determination indicates the "nature and extent" of a claimant's physical limitations and capacity for work activity on a regular and continuing basis. *Id.* § 404.1545(b). For example, "a limited ability to perform certain physical demands of work activity, such as sitting, standing,

walking, lifting, carrying, pushing, pulling or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching), may reduce [a claimant's] ability to do past work and other work." *Id*.

Here, the ALJ properly considered and evaluated the evidence to determine that Plaintiff could perform a substantial range of sedentary work. (R. 15.) Under the Social Security Administration's regulations, "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools." 20 C.F.R. § 404.1567(a). In making his RFC determination, the ALJ relied on the objective medical evidence, such as Plaintiff's MRIs and X-rays, in conjunction with the medical opinions of Plaintiff's treating, examining, and consultative physicians. All of these sources showed issues with Plaintiff's cervical and lumbar spine, knees and hips, however, the evidence consistently demonstrated these issues and any corresponding limitations were not significant.

The clinical imaging evidence supported the RFC assessment. Imaging of Plaintiff's cervical spine uncovered issues, but, as the ALJ found, the findings at each stage were mild. The July 27, 2010 X-ray of Plaintiff's cervical spine showed straightening of her cervical lordosis, found no significant foraminal stenosis, and was "otherwise unremarkable." (R. 235.) The ALJ recounted Plaintiff's March 17, 2011 MRI of her cervical spine, which also showed reversal of the cervical lordosis at the C4/5 vertebrae. (R. 16, 217.) That MRI did reveal disc hydration loss at the C2/3 through C4/5 level, and posterior disc bulges at the C4/5, C5/6, and C6/7 levels. (R. 217.) The bulges at the C4/5 and C5/6 impressed upon Plaintiff's thecal sac, and the C4/5 bulge also abutted Plaintiff's spinal cord. (*Id.*) There was also a superimposed posterolateral focal disc herniation" that "encroach[ed] into the right anterior recess." (*Id.*) The report noted, however, that there was no significant protrusion into the "neural canal, recesses, or foramina,"

and the cervical cord was "otherwise unremarkable in signal and morphology." (*Id.*)

Imaging of Plaintiff's lumbar spine also supported the ALJ's findings. The July 2011 X-rays of Plaintiff's lumbar spine noted that Plaintiff's vertebral bodies and intervertebral disc spaces were "relatively well maintained." (R. 254.) The overall impression was noted as "negative study." (*Id.*) The subsequent August 2011 MRI of Plaintiff's lumbar spine revealed hydration issues, and straightening of the lumbar spine. (R. 261.) The MRI also showed that Plaintiff's vertebral bodies had not lost "height." (*Id.*) Notably, there were no disc bulges or herniation. (*Id.*) The radiologist's impression was that Plaintiff had "minimal degenerative disease," in her lumbar spine, along with "straightening of the lumbar spine probably secondary to muscular spasm and/or strain." (*Id.*)

Imaging results for Plaintiff's hip, knee, and ankle were also mild and supported the ALJ's findings. The July 27, 2010 X-ray of Plaintiff's knee revealed "[m]ild osteoarthritic changes medially," and X-rays of Plaintiff's shoulder and ankle that day were "unremarkable" and revealed no fractures or dislocations. (R. 16, 236–38.) Based on the August 2, 2011 MRI of Plaintiff's left knee, the radiologist's impressions were that Plaintiff had (1) "medial meniscal degenerative change," (2) "minimal anserine bursitis," (3) "anterior cruciate ligament strain," and (4) "minimal joint effusion." (R. 260.) The August 5, 2011 MRI of Plaintiff's hips found bilateral hip joint degenerative disease and a minimal right femoral head cyst. (R. 259.)

As the ALJ found, the diagnoses and treatment by Plaintiff's physicians were conservative. (R. 19–20.) Dr. Robinson examined Plaintiff five days after the July 2010 Assault, recommending two weeks off from work pending the results of her X-rays. (R. 233.) Dr. Robinson obtained those X-rays, and two weeks later, he noted Plaintiff's complaints of worsening neck pain, but noted that the X-ray of her cervical spine noted reversal of its lordosis.

(R. 234.) He did not note functional limitations or recommend additional time off work; instead, he recommended ten milligrams of Flexeril, physical therapy and possibly an "EMG." (*Id.*) Dr. Teli's June 29, 2011 consultative examination revealed similarly mild issues. (R. 250–53.) Dr. Teli noted that Plaintiff was limited to an 80% squat due to knee pain, but that Plaintiff had full range of motion in her hips, knees and ankles, and no heat swelling, redness, or effusion in her joints. (R. 251–52.) Plaintiff's lumbar and cervical spine showed full flexion, extension, lateral flexion bilaterally, and full rotary movement bilaterally." (R. 250.) Plaintiff's strength was still "5/5" in her upper and lower extremities. (R. 252.) Dr. Teli found a mild restriction for squatting and gave Plaintiff a stable prognosis for her left knee and hip pain.[33] (*Id.*)

The ALJ assessed Plaintiff's RFC after a full review of the record evidence, expressly citing each opinion and clinical finding. This evidence reflected no significant limitations and revealed conservative treatment by her treating physician — both of which were similarly found by the consulting physician. As discussed below, the ALJ properly discounted Plaintiff's complaints of more severe and intense pain as incredible. As a result, the ALJ's detailed and well-reasoned RFC determination was based on substantial evidence, and is not a basis to remand the Commissioner's decision.

### iii. The ALJ properly assessed Plaintiff's credibility

The ALJ need not accept, but must at least consider, a claimant's reports of pain and other limitations and evaluate them through a two-step inquiry. *Campbell v. Astrue*, 465 F. App'x 4, 7 (2d Cir. 2012) (citing *Genier*, 606 F.3d at 49). First, "the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be

---

[33] Additionally, as the ALJ noted, records of Plaintiff's April 2012 psychological treatment at JBFCS note that Plaintiff reported working part time and attempting to start a non-profit organization at that time.

expected to produce the symptoms alleged," including pain. *Id.* (quoting *Genier*, 606 F.3d at 49). "If so, the ALJ must then consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence of record.'" *Id.* (alteration in original) (quoting *Genier*, 606 F.3d at 49). At the second stage, the ALJ must first consider all of the available medical evidence, including a claimant's statements, treating physician's reports, and other medical professional reports. *Whipple v. Astrue*, 479 F. App'x 367, 370–71 (2d Cir. 2012). To the extent that a claimant's allegations of pain "are not substantiated by the objective medical evidence, the ALJ must engage in a credibility inquiry." *Meadors v. Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)–(vii)). In conducting the credibility inquiry, the ALJ must consider seven factors.[34]

Here, the ALJ engaged in the required two-step inquiry and properly applied the standard for assessing Plaintiff's credibility. The ALJ recounted Plaintiff's complaints of pain in her left hip and, her vertigo that caused vomiting. (R. 18.) The ALJ determined that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but concluded that the intensity, persistence, and limiting effects of those symptoms were not credible. (R. 18–19.) In reaching this conclusion, the ALJ properly considered the relevant factors, assessing Plaintiff's reported daily activities, her hearing testimony "and other

---

[34] The factors are:

 (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain.

20 C.F.R. § 404.1529(c)(3)(i)–(vii); *see also Meadors v. Astrue*, 370 F. App'x 179, 183 n.1 (2d Cir. 2010) (quoting 20 C.F.R. § 404.1529(c)(3)(i)–(vii)).

allegations of record" about her symptoms and limitations, her "reluctance" to utilize pain medications, and her physicians' generally "conservative" treatment and care of her symptoms. (R. 19.)

The lack of corroboration in the objective medical evidence was highly relevant to the ALJ, and was assessed thoroughly rather than using boilerplate language. *Cf. Molina v. Colvin*, No. 13-CV-4989, 2014 WL 3445335, at *14 (S.D.N.Y. July 15, 2014) (noting that "boilerplate language about the claimant's subjective complaints being 'inconsistent with the above residual functional capacity assessment' has begun to appear in many ALJ decisions" without adequate analysis). The ALJ properly noted that despite Plaintiff's complaints about severe hip pain and having received a recommendation for a hip replacement, the medical evidence did not support these claims. (R. 19.) Plaintiff's recent hip MRI revealed only moderate narrowing of the hips "bilaterally" and a "minimal cyst" at the *right* femoral head, Dr. Robinson's records reveal conservative treatment as to her hips, and consulting physician, Dr. Teli, noted only a minor squat restriction.

Further, as the ALJ noted, Plaintiff testified about her wide range of daily activities, including taking care of her young son, bringing him to school, cooking and shopping for herself, and driving to her various appointments. The Court is mindful that "[w]hen a disabled person gamely chooses to endure pain in order to pursue important goals . . . it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working," *Balsamo*, 142 F.3d at 81–82, however, Plaintiff's testimony about these activities is inconsistent with her descriptions of severe and persistent pain and dizziness. Accordingly, the ALJ properly assessed Plaintiff's credibility.

### iv. Plaintiff can perform her prior relevant work

At step four of his analysis, the ALJ properly found that Plaintiff had the residual functional capacity to perform her prior relevant work as a residential supervisor. The ALJ's decision was supported by the testimony of the vocational expert who testified that the position of residential supervisor was sedentary work with an SVP of 6. (R. 21, 53.) The ALJ did find some limitations in connection with Plaintiff's residual functional capacity — concluding that Plaintiff was "limited to no more than frequent reaching with the upper extremities" and was "unable to work at high exposed places, or in proximity to moving mechanical parts." (R. 15, 21.) The Dictionary of Occupational Titles listing for this job, explicitly includes frequent reaching but no work at high exposed places or proximity to moving mechanical parts. *See* Dictionary of Occupational Titles, 187.167-186, 1991 WL 671408 (4th ed. 1991). As the ALJ found, the job of residential supervisor "does not require activities outside of [Plaintiff's] residual functional capacity." (R. 21.) Accordingly, the ALJ did not err at this step in his analysis, and properly determined that Plaintiff was not disabled.

### III. Conclusion

For the foregoing reasons, the Commissioner's motion for judgment on the pleadings is granted. The Court finds that the ALJ properly determined Plaintiff's RFC after considering and weighing the evidence from Plaintiff's treating physicians and record evidence as a whole. The ALJ also properly assessed Plaintiff's credibility. Accordingly, the Court affirms the Commissioner's decision.

SO ORDERED:

_____s/ MKB_____
MARGO K. BRODIE
United States District Judge

Dated: September 29, 2015
       Brooklyn, New York